[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON APPLICATION TO VACATE ARBITRATION AWARD
The grievant in this case was employed by the Metropolitan District Commission (MDC) for approximately five years. He initially worked as a WPC Foundry Crew Leader and in 1989 was promoted to WPC Shift Supervisor.
On July 15, 1992, the grievant received a memo from the MDC. The memo stated that the grievant had been notified of the need to secure a Class III Plant Operator's Certificate. The MDC alleges that the grievant did not have a Class III certificate and did not meet the requirements of his supervisor position. The memo further informed the grievant that as of July 26, 1992 he would be demoted to the position of WPC Operator Trainee.
The defendant union, in the grievant's behalf, requested arbitration pursuant to the agreement between the parties. The issues submitted by the parties were:
 Did the Metropolitan District Commission violate the terms of the collective bargaining agreement when on July 26, 1992 the District demoted Mr. James Miller to the position of WPC Plant Operator Trainee?
If so what shall the remedy be?
The parties further agreed according to the MDC that if the arbitration board found a contract violation, the parties would effectuate the remedy.
On May 4, 1994 the arbitration panel issued an award in the union's favor holding that:
 "The Metropolitan District violated the terms of the Collective Bargaining Agreement when on July 26, 1992 the District demoted Mr. James Miller to the position of WPC Plan Operator Trainee. The Grievant is entitled to sixteen (16) weeks of back pay."
The MDC has moved to vacate the award. First the court will discuss what might be called the appropriate standard of review that the court should apply in reviewing the award. Then the CT Page 4186-KKK court must determine whether given that standard, the award should be vacated.
1.
It is true that the actual language of submission to the arbitrators contained no restrictive language. It is also true that it is traditional law that:
 "When the scope of the submission is unrestricted the resulting award is not subject to de novo review even for errors of law so long as the award conforms to the submission." Garrity v. McCaskey, 223 Conn. 1, 4 (1992).
If in this case the submission can be defined as "unrestricted" then clearly the award should not be vacated since there is no claim here that the award violated some statute or regulation or otherwise violated public policy. The union claims that the submission here was a so-called "unrestricted" submission.
But it is also true that whether or not a submission is "unrestricted" or "restricted" is not to be determined by the language used by the parties in making the submission to the arbitrators — that is, whether that language contains restrictive language. The actual language used in the submission must be interpreted in light of the collective bargaining agreement. As said in Garrity at 223 Conn., page 5:
 "The authority of an arbitrator to adjudicate the controversy is limited only if the agreement contains express language restricting the breath of the issues reserving explicit rights or conditioning the award on court review. In the absence of any such qualifications, an agreement is unrestricted."
If the language of a submission contains no restrictive language that may constitute a waiver as to the arbitrability of the dispute, Board of Trustees v. Federation of Technical CollegeTeachers, 179 Conn. 184, 192 (1979); North Haven Assn. ofEducational Support Staff v. Board of Education, 209 Conn. 280,284 (1988). But arbitrability of the dispute is not at issue in this matter. What is at issue is whether, given the fact that there is an arbitrable dispute, the submission in light of the CT Page 4186-LLL agreement can be deferred as "restricted" or "unrestricted". An earlier case, Chase Brass Copper Co. v. Chase Brass CopperWorkers Union, 139 Conn. 591 (1953), made the point being discussed quite clear. The actual language of the submission in that case (see pp. 592-593), like the submission language here, contained no restrictive language. That did not prevent the court from in effect concluding the submission was not unrestricted; the court in that case concluded every submission made was a qualified one permitting the court to test the award against the underlying agreement.
This result appears to be dictated by the very nature of arbitration. As said in Connecticut Union of Telephone Workers v.SNET Co., 148 Conn. 192, 197-198 (1961):
 "Arbitration is a creature of contract. It is the province of the parties to set the limits of the arbitrators, and the parties will be bound by the limits they have fixed. The arbitration provision in an agreement is, in effect, a separate and distinct agreement. Courts of law can enforce only such agreements as the parties actually make. . . . The parties may, if they choose, confide to arbitrators the decision of legal as well as factual disputes. . . . The construction of the agreement and the determination of the intent expressed therein present an issue for the court."
To posit that the submission here was unrestricted merely because the submission language contains no restrictive language gets things, at least to me, exactly backwards. In other words, if the collective bargaining agreement were looked at separately from the submission language and it were to be concluded for one reason or another that in fact the arbitrator had restricted authority, how can it credibly be said that the restrictive language of the agreement is waived merely because the submission did not refer to the restrictive language of the agreement. The very acts of submission to the arbitrators is made in light of the respective rights the parties allege that they have under the agreement and its language.[1]
The question then becomes whether a submission under the agreement is a restricted submission. In this case the relevant language of the collective bargaining agreement as regards the scope of the arbitrator's authority reads as follows: CT Page 4186-MMM
 16. 5. The arbitration panel shall decide only one (1) grievance at a time. The decision of the panel shall be final and binding on the parties provided it is not contrary to law. The panel shall be bound by and must apply all the terms of this agreement, and shall have no power to add to, subtract from, or in any way modify the provisions of this agreement.
The term "contrary to law" has been made a word of art in our state as the result of the opinion in Chase Brass Copper Co. v.Chase Brass Copper Workers Union, 139 Conn. 591 (1953). The "contrary to law" language was used in the arbitration agreement before the court in that case. The court said, at pages 595-596:
 "In the case at bar, it was open to the parties to make an unrestricted or a restricted submission. `Arbitrators . . . are not bound to follow strict rules of law, unless it be made a condition of the submission'. . . . The parties elected to provide that the award should be final when — and, presumably, only when — it was not contrary to law. Every provision in a contract should be given effect. Byram Lumber Supply Co. v. Page, 109 Conn. 256, 264, 146 A. 293. `[P]roviding it is not contrary to law' imposes a more severe stricture on the conduct of the arbitrator than would the affirmative phrase that he must decide according to law. The parties must abide by their election.
 Although the provisions of the contract relating to arbitration endow the arbitrator with the power to interpret the other terms of the contract which are applicable to the facts of the dispute submitted to him, they also require, as just pointed out, that his award comply with the law. The interpretation of those terms is a matter of law. If the arbitrator has clearly misinterpreted the terms of the contract which he has applied to the facts to reach his award, then his award is contrary to law. The question before us is, therefore, whether the interpretation which the arbitrator must necessarily have placed on article X, § H(3), of the contract to make his award is tenable."
CT Page 4186-NNN
More recently the court has upheld the reasoning of ChaseBrass Copper. It referred to that case in saying:
 "Had the parties restricted the authority of the arbitrators by including in their arbitration agreement a proviso that the arbitrators' award must not be contrary to law, the court would have been bound to enforce the restriction. . . . Here there was no proviso. The arbitration proceeding in this case was, therefore, both voluntary and unrestricted, and the court should not have subjected the arbitrators' conclusions to de novo review." Bodner v. United Services Automobile Association, 222 Conn. 480, 490 (1992).
Because of the "contrary to law" language in this agreement, the agreement was a restricted agreement on arbitration and "that phrase qualified every submission". United Electrical Workers ofAmerica, Local 235 v. Union Manufacturing Company, 145 Conn. 284,290 (1958).
Since this is a restricted agreement the question for a trial court becomes, did the arbitrators act contrary to the law, that is, contrary to the language of the arbitration agreement. As said in Chase Brass Copper, the interpretation of the contract terms is a matter of law. If the arbitrators have clearly misinterpreted the terms of the contract which they have applied to the facts, then the award is contrary to law and a court can so find. The point being that since the submission is not unrestricted because of the contract language, the trial court can review de novo the arbitrator's conclusion of law — i.e., the interpretation of the contract agreement. Of course, having decided that an agreement is "restricted" does not mean that a court should completely ignore the arbitrators' interpretation of contract language. Some disputes referred to arbitrators involve highly technical and industry-bound issues concerning which arbitrators may have a level of expertise not to be expected of trial courts.
2.
The question before the court is whether the award of the arbitrators can be said to be in conformity with the agreement. CT Page 4186-OOO
The board found that the grievant was transferred or demoted from the position of WPC Plant Supervisor because he did not have the necessary Class III Operator's Certification. The board explicitly found that the grievant was not removed from this position for disciplinary reasons. It concluded that the transfer or demotion was a non-disciplinary involuntary demotion. The union took the position that the grievant should not have been transferred from his Plant Supervisor position. The board rejected this argument but concluded that under the agreement the grievant should not have been demoted down to the position of WPC Plant Operator Trainee but only to the position of WPC Journey Crew Leader until he obtained the Class III Plant Operator's Certificate. The grievant finally did obtain the necessary certificate and was reinstated to the supervisor position. The net effect of the board's ruling was that the grievant was found to be entitled to receive back pay in an amount reflecting the fact that for a period of time he was assigned to a working grade lower than the one to which he should have been transferred to after being demoted from the supervisor position.
The board based its ruling on § 5.6 of the agreement. The introductory paragraph states that:
 "In the event of reassignment of employees by the District for reasons including reorganization, change of classification, lack of work or fiscal difficulties the following procedures shall be adhered to. . . ."
The board went on to interpret subsections (a), (b) and (c) of § 5.6 as in effect requiring that an individual who is transferred should suffer the least amount of harm financially. Subsection 5.6(a) says that:
 "The most junior employees in the activity to be effected and most junior employee in the bargaining unit will be considered for reassignment to a position they previously held or they are considered qualified to perform. . . ."
Since the grievant previously held the position of WPC Journey Crew Leader he should have been demoted only to that position and not a trainee position reasoned the board.
The board also cites § 7.7(f) for its adoption of a CT Page 4186-PPP least amount of harm theory but his is a conclusory position since the language of § 7.7(f) merely says when an employee is demoted the pay shall be adjusted to the step nearest the present wage without any increase or to the maximum of the new grade if the present wage exceeds the maximum.
The real basis of the board's position is its reliance on the applicability of § 5.6. It concludes that the agreement is silent on the question of non-disciplinary involuntary demotion and thus § 5.6 should apply because it "speaks to a process for demotions based on other types of non-disciplinary actions." (P. 6 of the award.)
The problem with the board's decision, at least for the court, is the very introductory language of § 5.6 which is a predicate for application of its subsections. It talks about "reassignment of employees for reasons including reorganization, lack of work or fiscal difficulties" — these appear to all be non-disciplinary involuntary demotions, but the language is not "including but not limited to" but merely "including". The parties knew how to use "including but not limited to" language. They did so in fact in § 2.1 of the contract. The reason for the demotion here was lack of the necessary certificate to do the job or lack of qualifications. This is not included as one of the reasons listed as a predicate for the application of § 5.6. The board seems to concede as much when it says at page 6 of its award, "The contract is silent on demotions based on lack of qualifications" (which was what was involved here). But if the contract is silent how can the board change or add to it by applying the ameliorative provisions of § 5.6 to a demotion not covered by that section?
In fact, a more reasonable interpretation of the collective bargaining agreement is one that concludes the contract is not in fact silent on this matter. In fact, it would be surprising if a contract such as this would be silent on such a matter. In fact, Article 2 of the agreement would seem to apply to non-disciplinary involuntary demotions.
ARTICLE 2
DISTRICT RIGHTS AND RESPONSIBILITIES
 2; 1 Unless expressly limited by a specific section of this agreement, the rights, authority, powers CT Page 4186-QQQ and responsibilities of the District, as conferred by any general or special act of the Legislature or any District ordinances or regulation, including but not limited to all control and direction over employees of the District as well as the complete operational management of all facilities, policies and procedures used, shall remain vested solely and exclusively in the District.
 2.2 The District, unless expressly limited by specific terms of this agreement, shall retain the full and exclusive right to: a) determine standards of quality, schedules of operations, classification of jobs, assignment of work and methods, processes and levels of productivity: b) introduce new or improved production methods, facilities, services or products: and c) extend, limit, or curtail the operations of facilities or number of employees. (Emphasis added).
In other words, in the universe of possible demotions or transfers that could occur during the life of the collective bargaining agreement there are three categories — disciplinary demotions, non-disciplinary involuntary demotions of a type referred to in § 5.6 and other types of non-disciplinary involuntary demotions, one of which could be a demotion due to lack of proper qualifications. The latter type of demotion would then be authorized under the language of Article 2 which literally read would apply to this type of action. Such an interpretation would not conflict with any other portions of the agreement and comports with the rule that a contract must be read as a whole. Also the distinction between the treatment given to different types of non-disciplinary involuntary transfers or demotions seems to make some sense. It is understandable that the ameliorative provisions of § 5.6 should apply to a worker who is demoted for reasons having nothing to do with his or her work abilities or level of performance but have more to do with steps taken by the employer to protect its general financial interest. Thus, § 5.6 talks about demotions due to reorganization, change of classification, lack of work or fiscal difficulties. It is an entirely different matter to say the ameliorative provisions of § 5.6 should apply to a worker demoted because he or she did not have the appropriate qualifications for a job. The worker already received a gratuitous reward when he or she was put in a slot for which the worker was not qualified. Situations could be imagined where an estoppel or public policy CT Page 4186-RRR argument might be raised even under the terms of this contract when a worker is demoted from a position on the pretext that he or she did not have the proper qualifications for the job but no such claim was raised here. Given all this the posting procedure under § 5.7 was applicable and followed and this was appropriate in light of the rights reserved to management under Article 2 of the agreement.
For the foregoing reasons the plaintiff's application to vacate the award is granted.[2]
Corradino, J.